# Street v. Siemens Medical Solutions
# Health Services Corporation

*Steven A. Schwartz* and *E. Powell Miller,* for plaintiff.
*Michael L. Banks, Jennifer C. Bell, Megan E. Shafer,*
*Kay Kyungson Yu* and *Azeez Hyame,* for defendants.

BERNSTEIN, *J.,* July 27, 2004—Presently before this court is plaintiff's motion for class certification. Pursuant to Pennsylvania Rule of Civil Procedure 1710(a), this court accompanies its order with the following findings of fact, conclusions of law, and discussion.

Plaintiff claims this class action arises out of the wrongful retroactive 30 percent across-the-board reduction of incentive-based compensation earned by plaintiff Janet Street and approximately 1,000 employees of defendant Siemens Medical Solutions Health Services Corporation. Defendant Siemens paid employees incentive compensation pursuant to incentive compensation plans (ICPs). ICPs are calculated annually. Each year, goals are deter-

mined for each ICP participant, and participants are later paid compensation based on the extent to which they meet or exceed these goals. Plaintiff claims the uniform language in each ICP plan establishes that ICP compensation vests at year end and is payable at the end of the first quarter of the following year if the participant is still an employee. Defendant Siemens annually calculates the precise amount of ICP compensation earned by each participant pursuant to each participant's performance and ICP plan.

At the end of 1998, defendant Seimens calculated the amount of ICP compensation earned during the year by each member of the proposed class. These calculations resulted in a total of $45 million earned bonus payments. However, before making any payments, defendant Seimens reduced all ICP compensation by 30 percent to all members of the class. Plaintiff claims entitlement to this allegedly improper reduction before payment.

## DISCUSSION

The sole issue before this court is whether the prerequisites for certification of Pa.R.C.P. 1702 are satisfied. The purpose behind class action suits is "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996). For a suit to proceed as a class action, Rule 1702 of the Pennsylvania Rules of Civil Procedure requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

Rule 1708 of the Pennsylvania Rules of Civil Procedure requires:

"In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]

"(a) Where monetary recovery alone is sought, the court shall consider

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would con-

front the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

"(b) Where equitable or declaratory relief alone is sought, the court shall consider

"(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

"(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

"(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b)."

The burden of demonstrating each element in Rule 1702 is initially on the moving party. This burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.'" *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985). The moving party need only present evidence sufficient to make out a prima facie case "from which the court can conclude that the five class certification requirements are met." *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153-54 (Pa. Super. 2002) (quoting *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982)).

In other contexts, the prima facie burden has been construed to mean "some evidence," "a colorable claim," "substantial evidence," or evidence that creates a rebuttable presumption that requires the opponent to rebut demonstrated elements. In the criminal law context, "the prima facie standard requires evidence of the existence of each and every element . . . ." *Commonwealth v. Martin,* 727 A.2d 1136, 1142 (Pa. Super. 1999), *alloc. denied,* 560 Pa. 722, 745 A.2d 1220 (1999). However, "the weight and credibility of the evidence are not factors at this stage . . . ." *Commonwealth v. Marti,* 779 A.2d 1177, 1180 (Pa. Super. 2001).

In the family law context, "the term 'prima facie right to custody' means only that the party has a colorable claim to custody of the child." *McDonel v. Sohn,* 762 A.2d 1101, 1107 (Pa. Super. 2000). Similarly, in the context of employment law, the Commonwealth Court has opined that a prima facie case can be established by "substantial evidence" requiring the opposing party to affirmatively rebut that evidence. See *e.g., Williamsburg Community*

*School District v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission,* 99 Pa. Commw. 206, 512 A.2d 1339 (1986). The phrase "substantial evidence" means "more than a mere scintilla," and evidence "which a reasonable mind might accept as adequate to support a conclusion." *SSEN Inc., v. Borough Council of the Borough of Eddystone,* 810 A.2d 200, 207 (Pa. Commw. 2002).

In *Grakelow v. Nash,* 98 Pa. Super. 316 (1929), a tax case, the Superior Court said: "To ordain that a certain act or acts shall be prima facie evidence of a fact means merely that from proof of the act or acts, a rebuttable presumption of the fact shall be made; . . . it attributes a specified value to certain evidence but does not make it conclusive proof of the fact in question."

"The burden of proof to establish the five prerequisites to class certification lies with the class proponent; however, since the hearing on class certification is akin to a preliminary hearing, it is not a heavy burden." *Professional Flooring Co. v. Bushar Corp.,* 61 D.&C.4th 147, 153, (Montg. Cty. 2003), citing *Debbs v. Chrysler Corp.,* 810 A.2d 137, 153 (Pa. Super. 2002); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982). See also, *Baldassari v. Suburban Cable TV Co. Inc.,* 808 A.2d 184, 189 (Pa. Super. 2002); *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 501 A.2d 635 (1985). The prima facie burden of proof standard at the class certification stage is met by a qualitative "substantial evidence" test.

Our Superior Court has instructed that it is a strong and oft-repeated policy of this Commonwealth that decisions applying the rules for class certification should be made liberally and in favor of maintaining a class ac-

tion. *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 407, 615 A.2d 428, 431 (1992). See also, *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454, citing and quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir. 1968) ("in a doubtful case . . . any error should be committed in favor of allowing the class action"). Likewise, the Commonwealth Court has held that "in doubtful cases, any error should be committed in favor of allowing class certification." *Foust v. SEPTA,* 756 A.2d 112, 118 (Pa. Commw. 2000). This philosophy is further supported by the consideration that "[t]he court may alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." *Janicik,* 305 Pa. Super. at 129, 451 A.2d at 454.

The determination of whether a prima facie case has been established for class certification purposes is a mixed question of fact and law. *Debbs v. Chrysler Corp.,* 810 A.2d 137, 154 (Pa. Super. 2002). The court must appropriately consider all the relevant testimony, depositions and other evidence pursuant to Rule 1707(c). In determining whether the prerequisites of Rule 1702 have been met, the court decides only the preliminary procedural question of who shall be the parties to the action and nothing more. The merits of the action and the plaintiffs' right to recover are excluded from consideration. (1977 Explanatory comment to Pa.R.C.P. 1707.) In making a certification decision, "courts in class certification proceedings regularly and properly employ reasonable inferences, presumptions, and judicial notice." *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454. Accordingly, this court should refrain from basing its ruling on plaintiff's ultimate right to achieve any recovery, the cred-

ibility of the witnesses and the substantive merits of defenses raised.

Within this context, the court will examine the requisite factors for class certification.

At the court's direction, the parties have submitted a stipulation of facts. Accordingly, the court finds as fact:

### A. *Plaintiff's Employment with SMS*

(1) Plaintiff Janet Street began working at Shared Medical Systems, now known as Siemens Medical Solutions (SMS or the company), in August 1983. Ms. Street was employed by SMS in Pennsylvania, where SMS maintains its headquarters.

(2) Ms. Street signed an employment agreement with SMS on April 27, 1984.

(3) The April 27, 1984 employment agreement was neither amended nor rescinded during Ms. Street's employment.

(4) For the first five and a half months of 1998, Ms. Street was employed by SMS as an account executive.

(5) While employed as an account executive, plaintiff participated in an incentive compensation plan.

(6) In June 1998, plaintiff changed her position and began to work as an associate marketing representative.

(7) Plaintiff's employment with SMS ended in July 2001 as a result of her relocation to California and her voluntary resignation.

### B. *Incentive Compensation Plans at SMS*

(8) Certain eligible SMS employees receive incentive compensation in addition to their base salaries. In 1998, approximately 1,200 SMS employees had ICPs.

(9) The terms and conditions relating to the payment of incentive compensation, such as commissions and/or bonuses, are set forth in the ICPs.

(10) ICPs describe the terms by which SMS makes incentive compensation payments to eligible employees in a given plan year. ICP participants received a new ICP contract for each year. Over the years SMS paid employees incentive compensation pursuant to written ICPs on an annual basis.

(11) SMS' employees who are ICP participants receive ICP compensation for achieving goals/targets/objectives set forth in the ICPs.

(12) The purpose of the ICPs is to provide financial incentives in addition to salary for SMS employees to generate increased revenue and profit.

(13) During the first quarter of each year, SMS management promulgates the ICPs, which contain targets, goals, quotas, and other factors that are used to determine ICP compensation. The ICP participants are paid ICP compensation based on the provisions of their ICPs, including the extent to which they meet or exceed the targets, goals, quotas, and other factors as contained in their previously established ICPs.

(14) SMS management designed the ICP plans, including the 1998 plans, to align the interests of the ICP participants and SMS with respect to the profitability of sales and revenue generated by those ICP participants, and in order to induce employees to perform in accordance with SMS' business objectives.

(15) The ICPs operated on an annual basis. "Plan year" 1998 consisted of the time period January 1, 1998 through December 31, 1998.

(16) Most of the proposed 1998 ICPs were distributed to participants in or shortly after the first quarter of 1998. Employees who received ICPs had the opportunity to review and discuss the terms of the ICP with managers and supervisors.

(17) SMS' general practice was that each ICP participant signed the ICP each year.

(18) Certain ICP payments are made during the year as sales and deliveries occur. Other ICP payments are made after the end of a given year (usually in the first quarter of the following year), when final end-of-year sales, revenue, expense and financial results are gathered and analyzed.

(19) The ICPs provide that ICP compensation is payable no later than the end of the first quarter of the following year, provided the participant was still an SMS employee at the time of payment.

(20) In 1998, SMS had different forms of ICPs. Of record is a list of the 1998 ICPs and the number of participants in each such ICP. Certain provisions of those ICPs were identical or substantially similar, while other provisions differed. Certain provisions of the ICPs were tailored to the areas of the business in which participants worked and the positions held by the participants.

(21) SMS' CEO, Mr. Cadwell, and vice president of customer operations, Mr. Lavelle, believed the ICPs were contracts between SMS and participating employees.

(22) In addition to preparing annual ICPs, SMS budgeted each year for the payment of incentive compensation. In preparing budgets, representatives of the sales and finance organizations at SMS projected levels of sales, revenue and expenses for the upcoming year, tak-

ing into account the designs of the ICPs and the projected results of the sales forecasts.

(23) In preparing annual budgets, SMS management made projections of sales volumes, quality of sales, expenses associated with sales and the timing of the receipt of revenue. Since SMS sells complex software systems to hospitals and health systems, sales often involve future contingencies relating to the delivery, installation and utilization of these systems. An ICP participant may "book" or "record" a sale in a particular year, but the timing of the revenue or the profitability from the transaction may be uncertain at the time of the sale.

(24) SMS budgeted approximately $29 million for incentive compensation expense for 1998. The process of developing the 1998 ICP budget began in 1997, before financial results for 1997 had been determined. SMS' leadership team evaluated relevant information in connection with preparing the 1998 budget and had a high degree of confidence with respect to the budget based on the information available when the budget was prepared.

(25) The vice president of customer operations in 1998, Frank Lavelle, was ultimately responsible for approving ICPs in the sales organization.

## C. *Plaintiff's 1998 ICP*

(26) In March 1998, plaintiff received a copy of her ICP for the period January 1, 1998 through December 31, 1998.

(27) Section I of plaintiff's 1998 ICP, entitled "Compensation components" provided that:

"The compensation paid to participants under this plan, if any, is only one portion of a participant's overall compensation. This plan and the associated targets/quotas may be adjusted, changed, or terminated at any time, to compensate for changes in sales, support or marketing emphasis.

"Any portion of this incentive compensation plan is subject to adjustment by the relevant senior vice president, based on the non-fulfillment of job duties by the participant. Any such adjustment will be incorporated in the 1998 commission statements presented to the participant."

(28) Section III.F of plaintiff's 1998 ICP, entitled "Individual performance objectives," provided, in part, that:

"Participants may be assigned individual performance objectives based on their job responsibilities. The participant can earn a bonus based on performance, based on the objectives assigned and approved by the vice president. All projects will be scored on a scale of 1.0 to 5.0 (5.0 being high). Attainment of points will be determined by the vice president and the bonus will be earned as follows:

"Total points earned/Total points (no. of projects x 5.0 points) x Bonus potential = Bonus earned

"The maximum bonus earned is 100 percent."

(29) Section V.A of plaintiff's 1998 ICP, entitled "Vesting of commissions," provided that:

"Except where specifically stated, this plan does not provide for vesting of any plan component prior to the end of the plan year. Further, no commission or bonus will be paid under this plan to a participant who termi-

nates employment on, or before, the date on which payment under the plan is made."

(30) Section V.C of plaintiff's 1998 ICP, entitled "Commission adjustments," provided that: "The vice president may direct that a commission be adjusted. Any adjustments made will affect both attainment and commissions."

(31) Section V.E of plaintiff's 1998 ICP, entitled "Timing of commission payments," provided that:

"Incentive compensation earned under this plan shall be paid by March 31, 1999. The participant must be an active SMS employee on March 31, 1999, to be eligible for payment under this plan. Draws will be subtracted from the amount of the final commission payout. Commission inquiries for any commission payment in dispute must be received in sales analysis and ICP support no later than 60 days from the receipt of any commission statement."

(32) Plaintiff's 1998 ICP described two potential components of incentive compensation that were payable: (1) CSS solution growth sales objective (percent of quota) with a bonus potential of $4,000; and (2) individual performance objectives with a bonus potential of $11,000.

(33) Plaintiff read the terms of her 1998 ICP when she received it in or about March of 1998.

## D. *Adjustments of 1998 Incentive Compensation*

(34) During the year, SMS' finance department tracks performance, and projects total expected annual ICP compensation on a continual basis based on revenue, sales, expenses, profitability and other relevant factors set forth in the ICPs.

(35) On April 15, 1998, an employee in SMS' accounting department, Phil Mullen, noted in a handwritten, internal SMS memorandum that the amount budgeted in late 1997 for 1998 ICP expense appeared to be low based on first quarter 1998 and historical data.

(36) In September and October 1998, as the amount of the projected variance increased between the original budgeted figure and mid-year forecasted ICP expenses, Mr. Mullen prepared internal memoranda listing a variety of suggestions to limit incentive compensation expenses.

(37) By October 1998, SMS senior management recognized that the amount of incentive compensation projected was a problem which needed to be addressed.

(38) The SMS leadership team considered a number of possible steps to address the profit margin issues, including salary reductions, potential layoffs or cancellations of certain service contracts. The leadership team also looked at the possibility of reducing the ICP payments.

(39) The final numbers for 1998 showed that SMS revenues, sales, expenses, and profits were higher in 1998 than in 1997. Profit margin was lower in 1998, which was a concern to senior management who believed this signaled a negative trend in the quality and profitability of sales.

(40) When final 1998 sales and revenue results were reviewed in January 1999, the finance organization projected that ICP payments for 1998 would likely be in the range of $46 million. Mr. Cadwell, Mr. Lavelle, and the other members of the leadership team concluded that the $46 million amount would be inconsistent with the fi-

nancial results achieved. Accordingly, they decided to adjust the ICP payments to a level which they believed to have been more consistent with 1998 financial results.

(41) After much discussion, the leadership team decided to impose a 30 percent across-the-board downward adjustment of ICP payments. The board of directors was not asked to consider and did not consider this adjustment. Board of directors' approval was not required for this decision.

(42) The ICP payments due in the first quarter of 1999 related to participants' 1998 performance and events occurring in 1998. After December 31, 1998, ICP participants did not have the ability to increase the amounts payable to them for that year pursuant to the 1998 ICPs.

(43) For every year prior to 1998, SMS calculated ICP compensation pursuant to a process whereby after year end SMS calculated each participant's compensation based on all factors relevant to their specific ICP.

(44) The results of this process were reflected in a commission statement generated for each ICP participant that reflected the precise amount of ICP compensation calculated for that participant for that year.

### E. *The SMS Adjustment*

(45) Plan year 1998 was the first time that SMS made a widespread percentage reduction of this nature (the SMS adjustment).

(46) SMS generated a 1998 commission statement or statements for each ICP participant that had line items reflecting: (i) the precise amount of ICP compensation that SMS calculated for that participant; and (ii) the SMS

adjustment showing the reduction of that calculated amount.

(47) Plaintiff does not challenge SMS' ICP calculations for individual participants based on their performance and the terms of their ICPs that were made independently of the SMS adjustment, and does not dispute SMS' determination of incentive compensation for each individual participant other than the SMS adjustment.

(48) Without the SMS adjustment, the ICP compensation payable for 1998 would have been approximately $46 million.

(49) The determination of the amount of the SMS adjustment to be applied to each participant was not based on an assessment of each such participant's performance. SMS did, however, uniformly cap the SMS adjustment at $50,000 so that no participant received a reduction of greater than $50,000. The decisions to utilize a cap and to set the cap at $50,000 were not based on the individual performance of ICP participants affected by the cap or the formulas in those participants' ICPs.

(50) The total dollar amount of the SMS adjustment was in the range of $12-15 million dollars.

(51) SMS employees who participated in ICPs in 1998 received commission statements in or about March 1999 that reflected calculations of their incentive compensation using the formulas set forth in the ICPs, and then showing the SMS adjustment as it applied to them.

(52) Some members of senior management received no ICP compensation for 1998 because the company failed to meet minimum budgeted performance targets that were a condition of such payments in their ICPs.

(53) The ICP participants in the proposed class worked for SMS' North American Operations and did not cause SMS' European losses.

(54) For 1998, SMS recorded revenues, expenses, and profits that were higher than any prior year. These results were generated, in part, by the efforts during 1998 of the ICP participants and other SMS employees, together with market conditions. From 1997 to 1998, even after the SMS adjustment, expenses at SMS increased by approximately $200 million. Absent the SMS adjustments that were approved by the SMS leadership team, profits for the year 1998 would have been lower than in 1997 notwithstanding substantial increases in sales and revenue.

(55) SMS' 1998 combined margins for North America were essentially the same as in 1997 at 13 percent, but were impacted by the continued use of outside consultants. North American margins, excluding hardware, declined in 1998. Margins were impacted both by losses in European operations and changing cost structures in North America. Absent the adjustments in ICP compensation that were approved by the SMS leadership team, profit margins for the year 1998 would have been lower than in 1997 notwithstanding substantial increases in sales and revenue.

(56) The primary reason for the increase in the amount of 1998 ICP compensation that would have been payable by SMS absent the SMS adjustment, as compared to 1997 ICP compensation and the amount budgeted for 1998, was a significant increase in the amount of sales in 1998 compared to 1997.

(57) Mr. Cadwell, SMS' CEO in 1998, believed that a clause that was present in the same or substantially the same form in the ICPs gave SMS the right to apply the widespread reduction.

(58) The clause referenced by Mr. Cadwell, as it appears in Ms. Street's 1998 ICP, states: "This plan and the associated targets/quotas may be adjusted, changed, or terminated at any time, to compensate for changes in sales, support or marketing emphasis." This clause or a substantially similar clause appears in at least 95 percent of the 1998 ICPs.

(59) The SMS leadership team believed ICP contracts could be changed at any time for any reason.

(60) Mr. Lavelle believed the sales made in 1998 by ICP participants were a good investment for the future of SMS. Mr. Lavelle also believed that there were problems with the quality and profitability of the 1998 sales which contributed to the decision to make the SMS adjustment.

(61) Mr. Lavelle believed that, in connection with the SMS adjustment, it was not necessary to review the specific provisions of all the ICPs, because he was comfortable that all of the ICPs had some or all of the provisions he believed permitted SMS to make the reduction.

(62) Mr. Lavelle believed that the language of the ICPs gave SMS the right to reduce ICP compensation by any percentage, up to 100 percent, after the end of the plan year.

(63) Mr. Lavelle believed that ICP participants expected payment for services rendered based on their ICPs.

(64) According to the SMS Q&A prepared by senior management regarding the SMS adjustment, "Fundamen-

tally the company is financially strong" because ICP participants "sold in excess of $1.4 billion in 1998" and "[t]hat revenue is coming to [SMS] in 1999 and beyond." In explaining why the SMS adjustments were being made, the Q&A states that: "Out of financial responsibility and necessity, the company must make changes to the anticipated payouts for variable pay plans, including incentive compensation plans and commission plans, to match the variability of company performance." As for the focus on variable pay rather than base compensation, the Q&A provided that: "By definition, variable pay should fluctuate with the performance of the individual and the company." Explaining why the adjustments were being made in spite of increased sales, the Q&A states that: "North American pretax profit margin rates have declined in each quarter of 1998 versus the same quarter in 1997. Having and sustaining a potent sales capability is essential to our success, but we also need to deliver on our commitment to our shareholders on improving our profit margins and controlling expenses."

(65) In its conference call with analysts after the close of 1998, SMS represented "Our sales performance in 1998 was again extraordinary" and "most of these sales are contained in the company's backlog at January 1, 1999." In the same conference call, SMS management noted that profit margins were impacted by changing cost structures in North America. The analysts were also provided with financial statements showing comparisons of final 1997 and 1998 results.

(66) SMS' 1998 annual report, filed with the SEC, does not mention the SMS adjustment that the company made with respect to 1998 ICP compensation. The shareholder

letter, signed by Mr. Cadwell, states, in part: "SMS' people are our greatest asset. Their expertise, customer focus, and breadth of knowledge related to technology and healthcare provide a strong foundation upon which to build the solutions the health industry will demand as we enter the 21st Century."

(67) SMS' 1998 year-end press release reporting 1998 fourth quarter and year-end results does not mention the SMS adjustment that the company made with respect to 1998 ICP compensation.

(68) SMS' leadership team made the decision to make the SMS adjustment of 1998 ICP compensation. That decision was not made by SMS area vice presidents.

F. *Plaintiff's Incentive Compensation Payments*

(69) On May 15, 1998, plaintiff received an incentive compensation payment in the amount of $928.81. On May 31, 1998, plaintiff received an incentive compensation payment in the amount of $2,147.93. On July 31, 1998, plaintiff received an incentive compensation payment in the amount of $100. These payments were based on pre-1998 events or work performed, and therefore were not reduced or adjusted.

(70) In March 1999, plaintiff received an incentive compensation payment for 1998 in the amount of $3,768.98.

(71) The 1998 incentive compensation payment, which was paid to plaintiff in March 1999, was calculated based on: (1) a CSS solution growth sales objective bonus in the gross amount of $2,290.51; and (2) an individual performance objectives bonus in the gross amount of $3,093.75. These bonuses in the total gross amount of $5,384.26 were reduced by $1,615.28, or 30 percent.

(72) The 1998 ICP payments made to plaintiff in March 1999 were not tied to specific sales by plaintiff. They were based on assessments of her performance by her manager, and the overall performance of her unit in 1998.

(73) Plaintiff believed that the individual performance objectives bonus was based on her manager's subjective opinion of how she performed. She knew the maximum that she was likely to earn if she met her objectives, but not how the amount would be determined or whether she would receive the targeted amount.

(74) Plaintiff believed that the amount of incentive compensation that she would be paid was not automatic, but was dependent on how her performance was rated. She viewed her incentive compensation as a reward for performing her job in a certain way. As of the end of 1998, plaintiff did not know whether she would receive the full targeted amount, because she did not know how her manager viewed her performance.

(75) The other portion of plaintiff's 1998 incentive compensation—the CSS solution growth sales objective—was determined based on the extent to which plaintiff's business unit met its targets. Plaintiff understood that depending upon how her business unit performed, she might receive more or less than the targeted bonus amount.

(76) After the SMS adjustment was announced in February 1999, plaintiff reviewed her ICP. Plaintiff believes that, after reviewing the ICP, she concluded that SMS probably had the legal right to make the adjustment. She also thought morally the adjustment was more than questionable. There was nothing in the ICP, either a particu-

lar phrase or in the context of the document as a whole, that plaintiff recalled reading in February 1999 that led her to conclude that the company did not have the right to make the SMS adjustment.

(77) Ms. Street never complained formally about the $1,615.28 adjustment of her ICP compensation for 1998. The only time that she voiced any protest to a member of senior management was at two o'clock in the morning after the 1999 national sales meeting at a time when Ms. Street was intoxicated after drinking at least several martinis. Without identifying herself, Ms. Street stated to Mr. Lavelle (who did not know her by sight) and several other managers, including Mr. Shihadeh (who knew her) that she believed that the reduction was impulsive and unfair. She waited a little bit and after receiving no response, walked away. Ms. Street does not believe she was subjected to retaliation or discipline at any time after she made this remark.

(78) At or near the time Ms. Street first learned that SMS would reduce her calculated ICP compensation by 30 percent, she was told by SMS management that SMS had the legal right to make such a reduction based on language set forth in all the ICPs, including hers, that SMS reserved the right to change or adjust the ICP commissions and related targets/quotas.

(79) The SMS Talking Points contain the following: "Some of you are probably thinking 'Is this legal?' We have reviewed this with the lawyers, and we have good grounds for the actions." This Talking Point was communicated in numerous discussions in various forums between SMS managers at various levels and ICP participants, including to Ms. Street.

(80) In connection with the SMS adjustment to 1998 ICP compensation, Ms. Street was not singled out for any reason specific to her.

(81) Any individualized issues relating to Ms. Street's 1998 ICP compensation were addressed independently of, and without regard to, the SMS adjustment that was announced in February 1999.

(82) Ms. Street responded fully to all discovery propounded to her.

### G. *The Putative Class*

(83) Approximately 1,200 SMS employees were affected by the SMS adjustment.

(84) As a result of the SMS adjustment, more than 25 putative class members had an SMS adjustment of $50,000.

(85) As a result of the SMS adjustment, more than 380 putative class members had a reduction of more than $10,000.

(86) As a result of the SMS adjustment, more than half of the putative class members had a reduction of more than $5,000.

(87) In 1998, ICP participants worked for SMS in over 40 different states.

(88) Approximately 500 ICP participants worked for SMS in Pennsylvania.

(89) Approximately 100 ICP participants worked for SMS in California.

(90) Approximately 60 ICP participants worked for SMS in Florida.

(91) Approximately 50 ICP participants worked for SMS in Georgia.

(92) Approximately 50 ICP participants worked for SMS in Ohio.

(93) Approximately 50 ICP participants worked for SMS in New York.

(94) Approximately 40 ICP participants worked for SMS in Illinois.

(95) Approximately 40 ICP participants worked for SMS in Utah.

(96) Approximately 40 ICP participants worked for SMS in Texas.

(97) Approximately 40 ICP participants worked for SMS in Illinois.

(98) Approximately 40 ICP participants worked for SMS in New Jersey.

(99) Approximately 40 ICP participants worked for SMS in Michigan.

(100) Approximately 30 ICP participants worked for SMS in Virginia.

(101) Approximately 30 ICP participants worked for SMS in North Carolina.

(102) Approximately 20 ICP participants worked for SMS in Louisiana.

(103) Approximately 20 ICP participants worked for SMS in Arizona.

(104) Approximately 20 ICP participants worked for SMS in Missouri.

(105) The remaining ICP participants worked for SMS in approximately 25 other states including, for example, Alabama, Colorado, Delaware, Indiana, Kansas, Ken-

tucky, Maine, Maryland, Massachusetts, New Hampshire, Oklahoma, South Carolina, Tennessee, Washington, and Wisconsin.

## H. *SMS Pennsylvania Connections*

(106) SMS is incorporated in Delaware and has its principal place of business in Pennsylvania.

(107) The form of employment agreement used by SMS in 1998, including ICP participants based outside of Pennsylvania, contained the following choice of law provision: "This agreement (i) may not be amended except in a writing executed by both parties; (ii) shall only be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, . . . . If any portion of this agreement is deemed to be unenforceable, the balance of this agreement shall nevertheless continue in effect and any court may enforce any provision to the extent permitted by law, even though the entire provision may not be enforced." The form of employment agreement does not specifically reference the ICPs or the terms of payment of ICP compensation.

(108) Ms. Street's employment agreement with SMS (dated April 27, 1984) provides that "This agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania."

(109) All or substantially all of SMS' employment agreements with the 1998 ICP participants contain a similar if not identical Pennsylvania choice of law provision.

(110) The ICPs in effect in 1998 do not contain a choice of law provision.

(111) SMS' decision to adopt and implement the SMS adjustment was made in Pennsylvania by members of SMS' leadership team.

(112) Mr. Lavelle, who was based in SMS' Pennsylvania headquarters, had to give final approval to ICPs for participants in his organization.

(113) SMS consulted with and received advice provided by its in-house counsel, who is a Pennsylvania lawyer working out of SMS' Pennsylvania headquarters, in connection with its decision to make the SMS adjustment to ICP compensation.

### I. *Restricted Stock Grants in September 1999*

(114) SMS never reversed in full or part the SMS adjustment in 1998 ICP compensation of any proposed class member.

(115) SMS believes that once an SMS adjustment, such as the 1998 SMS adjustment, is made, such adjustment could not be reversed via negotiation or settlement.

(116) SMS prepared a detailed set of "Talking Points" and form questions and answers (Q&As) reflecting what management should tell ICP participants about the SMS adjustment.

(117) The Talking Points, under the heading, *The Need for Commitment Going Forward,* includes a statement that, as SMS proceeds into 1999, SMS senior management "will be looking for available ways to recognize [SMS employees'] 1999 performance and the investment [they] have now made in the company's future."

(118) The Talking Points, under the heading, *The Need for Commitment Going Forward,* also contain the state-

ment that "we are actively pursuing other ways to recognize and reward performance as we go forward."

(119) In September 1999, pursuant to a resolution of the SMS board of directors, SMS granted restricted stock to nearly 800 employees, most of whom had been subject to the SMS adjustments.

(120) At the time of the grants in September 1999, the restricted stock had a three-year vesting period that was tied to continued employment. SMS was acquired by Siemens in 2000. As a result of the acquisition, the restricted stock was treated as vested and the recipients of the 1999 restricted stock awards who were still SMS employees received payments based on an acquisition price of $73 per share.

(121) Any restricted stock that SMS provided to any of its employees in late 1999 was not a delayed payment of 1998 ICP compensation.

(122) ICP participants gave up no rights in exchange for the restricted stock, nor did SMS ask any of the employees who received restricted stock in September 1999 to give up any rights they may have had in order to participate in the restricted stock program.

(123) When SMS provided restricted stock to certain of its employees in September 1999, there was no official communication authorized by the leadership team which stated that the reason for issuing restricted stock was to make up for the SMS adjustment of 1998 ICP compensation.

(124) Not all of the ICP participants who were subject to the SMS adjustment received the restricted stock awards.

(125) At the same time that the leadership team was evaluating and deciding on the SMS adjustment, the lead-

ership team also considered the possibility of granting restricted stock in lieu of implementing the SMS adjustment.

(126) One reason that SMS provided restricted stock in September 1999 was to boost employee morale. SMS also took other steps to boost employee morale, such as adding or increasing benefits related to elder care, days off, and flex time.

(127) Plaintiff did not receive SMS restricted stock in September 1999 or at any time thereafter.

### J. *Miscellaneous*

(128) The ICP participants who were subject to the 1998 SMS adjustment are readily identifiable through defendant SMS' records.

### I. Numerosity

To be eligible for certification, appellant must demonstrate that the class is "so numerous that joinder of all members is impracticable." Pa.R.C.P. 1702(1). A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should such potential plaintiffs sue individually." *Temple University of the Commonwealth System of Higher Education v. Pennsylvania, Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 members sufficient); *ABC Sewer Cleaninq Co. v. Bell of Pa.,* 293 Pa. Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin Inc. v. Bell Telephone Company of Pennsylvania,* 291 Pa. Super. 40, 435 A.2d 208 (1981) (204

plaintiffs sufficiently numerous). Appellant need not plead or prove the actual number of class members, so long as he is able to "define the class with some precision" and provide "sufficient indicia [to the court] that more members exist than it would be practicable to join." *Janicik,* 305 Pa. Super. at 132, 451 A.2d at 456.

The parties have stipulated that approximately 1,200 participants sustained reduction in compensation pursuant to the uniform SMS adjustment of 30 percent. More than 25 participants sustained reductions of $50,000, and more than half of all of the participants sustained reductions of over $5,000.

The plaintiffs have satisfied the numerosity requirement for class certification of the proposed class.

## II. Commonality

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa.R.C.P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent." *Janicik, supra* at 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). Where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. "While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be

justly resolved in a single proceeding." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 452, 500 A.2d 1137, 1142 (1985).

In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. "Once a common source of liability has been clearly identified, varying amounts of *damages* among the plaintiffs will not preclude class certification." See *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). (emphasis in original) Where there exists intervening and possibly superseding causes of damage, however, liability cannot be determined on a class-wide basis. *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. 222, 231, 530 A.2d 499, 504 (1987).

Plaintiff argues that questions of law and fact common to the class exist. Defendants claim that individual issues of law and fact exist and predominate. After reviewing all material submitted and of record in this matter, and in consideration of the briefs, and argument of counsel, this court finds that common issues of law and fact predominate.

The claim presented herein is an alleged unlawful 30 percent across-the-board reduction in the payments to ICP participants. The issues presented for adjudication may be suitable for summary judgment disposition since there are virtually no disputed facts. The case primarily, if not exclusively, consists of contract interpretation as a matter of law. Neither side contends that the contracts for interpretation herein are ambiguous. The plaintiff claims that the bonuses were properly evaluated in accord with the adjustment clause, the plan vesting clause, and the commission adjustment clause of the ICP, and

plaintiff does not contest the accuracy of these calculations. Plaintiff contends as a matter of contract law and proper interpretation that the 30 percent across-the-board reduction had no basis in any contract language and that each class member is entitled to the amount calculated prior to the 30 percent reduction before payment. The defendant contends that pursuant to contract law and proper interpretation the defendant was entitled to make an across-the-board 30 percent reduction. Thus the question presented is whether defendant SMS could lawfully adjust the bonus uniformly prior to payment but after year end. As such, the requirement of commonality is met.

The case does not even present any factual disputes as to the amount each class member should receive in compensation. The allegedly improper 30 percent deduction is a specific and disclosed amount, calculated by the defendant and disclosed to each class member before litigation. Plaintiff agrees that this is the only measure of damages. All other claims present under the Pennsylvania Wage Act and Collection Law, 43 P.S. §260.1 et seq., simply is a multiple of the calculated amount of their contractually earned compensation less 30 percent for the 1998 year.

The defense claims that employees working in other states may not be protected by the Pennsylvania Wage Act and Collection Law. While it is correct that Pennsylvania law does not have extraterritorial force, this principle can be changed by contract. Uniformly required contract language of every Seimens employee's "Employment agreement" makes Pennsylvania law applicable. Defendant Siemens required all of its employees, including those working outside of Pennsylvania, to agree

to a mandatory Pennsylvania choice of law provision in their employment agreements.

The employment agreements are unambiguously titled "Employment agreement." Defendant Siemens' employment agreements were intended to encompass all terms and conditions of the employment. Section 8.0 of the Form 1998 employment agreement states: "This agreement . . . represents the entire agreement and understanding of the parties with respect to the subject matter hereof . . . ." One subject matter of the "Employment agreement" is, "Employment, compensation and benefits" (section 1.0). ICP agreements are supplemental compensation benefits designed to provide financial incentives to SMS employees to generate revenue and profit.[1] Both parties have stipulated that "SMS management designed the ICP plans, including the 1998 plans, to align the interests of the ICP participants and SMS with respect to, among other things, the profitability of sales and revenue generated by those ICP participants, and in order to induce employees to perform in accordance with SMS' business objectives."[2] Therefore, by signing an employment agreement, agreeing to be bound by Pennsylvania law, all class members have agreed to submit all employment disputes for resolution under Pennsylvania law.

Each and every form of employment agreement used by defendant Siemens in 1998, including ICP participants based outside of Pennsylvania, contained the following choice of law provision: "This agreement (i) may not be amended except in a writing executed by both parties; (ii) shall only be governed by and construed in

---

1. Joint statement of stipulated facts no. 12.
2. Joint statement of stipulated facts no. 14.

accordance with the laws of the Commonwealth of Pennsylvania . . . ." ICP compensation is one portion of the participant's overall compensation. The terms of the ICPs reflect the obvious connection between the ICP contracts and the participants' employment contracts as related to their compensation. Nothing within either the employment agreements or the ICP agreements suggest that the Pennsylvania choice of law provision does not apply to all aspects of defendant Siemens' compensation policies, including the ICPs. Defendant Siemens cannot require all employee compensation disputes to be decided under Pennsylvania law except the protections afforded by the Pennsylvania Wage Act and Collection Law unless said exception is specifically articulated. The court finds that the claim presented does satisfy the commonality requirement of Rule 1702(2).

## III. Typicality

The third step in the certification test requires the plaintiff to show that the class action parties' claims and defenses are typical of the entire class. The purpose behind this requirement is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members, to ensure that pursuit of their interests will advance those of the proposed class members. *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 404, 676 A.2d 1237, 1242 (1996).

The defense claims that variations in the calculations of ICP bonuses preclude a finding of typicality. However, in excess of 90 percent of the 39 "different" contracts of record contain the same "Plan adjustment clause"

and the exact "Plan vesting clause" which are at the heart of this controversy. More than 60 percent contain the same "Commission adjustment clause." The variations in the language which do not exist are not material to the determination of this case since they differ primarily in the criteria for adjustment or the character of the supervisory personnel obliged to determine applicable adjustments. Since plaintiffs are not challenging the propriety of any individualized adjustments but only the propriety of the across-the-board 30 percent adjustment after the required calculation in each contract was made, these language differences in some contracts do not change the commonality of the issues presented or the typicality of the plaintiff's claim herein. The court finds that the claim presented does satisfy the typicality requirement of Rule 1702(3) in that plaintiff's claims are typical of the entire class.

## IV. Adequacy of Representation

For the class to be certified, this court must also conclude that the plaintiff "will fairly and adequately assert and protect the interests of the class." Pa.R.C.P. 1702(4). In determining whether the representative parties will fairly and adequately represent the interests of the class, the court shall consider the following:

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

"(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

"(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed." Rule 1709.

"[U]ntil the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." *Janicik,* 305 Pa. Super. at 136, 451 A.2d at 458. Here, defendants do not challenge plaintiff's counsels' skill and therefore, the court presumes that counsel is skilled in their profession.

"[C]ourts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." *Janicik,* 305 Pa. Super. at 136, 451 A.2d at 458. Defendants argue that there are conflicts of interest between the representative of the class and other class members because of potential differences in class member's beliefs as to the legality of the across-the-board 30 percent reduction and the intention of management in making this reduction. This court has reviewed the claims of conflict and applicable case law and finds the named class representatives' interests do not conflict with those of the proposed class, and that no conflict exists between plaintiff's counsel and the named class representative or the class that would preclude representation. The adequacy of representation requirement of Rule 1702(4) has been met.

## V. Fair and Efficient Method of Adjudication

The final criteria under Pa.R.C.P. 1702 is a determination of whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708. Since the court has determined that a class satisfies the other requirements of Pa.R.C.P. 1702 and plaintiff does not request equi-

table relief, it is not necessary to consider subdivision (b) of Rule 1708.

## 1. *Predominance of common questions of law and fact*

The most important requirement in determining whether a class should be certified under Rules 1702(5) and 1708(a)(1) is whether common questions of law and fact predominate over any question affecting only individual members. In addition to demonstrating the existence of common questions of law and fact, plaintiff must also establish that the common issues predominate. The analysis of predominance under Rule 1708 (a)(1) is closely related to that of commonality under Rule 1702(2). *Janick, supra* at 141, 451 A.2d at 461. The court adopts and incorporates its analysis of commonality and concludes that the requirement of predominance has been satisfied. As stated above, a claim for interpretation of contract is presented, and should plaintiff prevail, the ministerial mathematical calculation of refunds or other sums owing.

## 2. *The existence of serious management difficulties*

Under Pa.R.C.P. 1708(2), a court must also consider the size of the class and the difficulties likely to be encountered in the management of the action as a class action. While a court must consider the potential difficulties in managing the class action, any such difficulties generally are not accorded much weight. Problems of administration alone ordinarily should not justify the denial of an otherwise appropriate class action, for to do so would contradict the policies underlying this device.

*Yaffe v. Powers,* 454 F.2d 1362 (1st Cir. 1972). Rather, the court should rely on the ingenuity and aid of counsel and upon its plenary authority to control the action to solve whatever management problems the litigation may bring. *Id.* (citing *Buchanan v. Brentwood Federal Savings & Loan Assoc.,* 457 Pa. 135, 320 A.2d 117 (1974)).

Defendants argue that class treatment would not be fair and reasonable since there are individual fact issues which render class treatment unmanageable. However, the only individual issue presented is the simple mathematical calculation of the amount of unpaid bonus, if any, owed to each class member. No other individual issues whatsoever have been demonstrated. Any individualized differences in the contract language which may appear to be material can be managed by the creation of subclasses if necessary.[3] This court does not find any subclasses necessary at this time. Whatever other management problems remain, this court will rely upon the ingenuity and aid of counsel and upon the courts plenary authority to control the action. *Janicik,* 305 Pa. Super. at 142, 451 A.2d at 462.

### 3. *Potential for inconsistent adjudications*

Pennsylvania Rule 1708(a)(3) also requires a court to evaluate whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class. In considering the separate effect of actions, the precedential effect of a decision is to be considered as well as the parties' cir-

---

3. The court notes that certain contracts with perhaps 200 participants have not been produced in full.

cumstances and respective ability to pursue separate actions. *Janicik,* 305 Pa. Super. at 143, 415 A.2d at 462.

There is no risk of inconsistent adjudications since the only claim presented is the interpretation of contract, and, if necessary, the ministerial calculation of sums owed. Nonetheless, as a certified class, one case will determine liability and a multiplicity of litigation is rendered unnecessary and the potential for inconsistent adjudications, until finality is achieved at the appellate level, is precluded.

### 4. *Extent and nature of any preexisting litigation and the appropriateness of this forum*

Under Pa.R.C.P. 1708(a)(4) and (a)(5), a court should consider the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues. The court has not been advised of any preexisting litigation. In light of the facts that at least 500 ICP participants worked in Pennsylvania for SMS, a Pennsylvania company, and that most if not all of the relevant important decisions in this case were made in Pennsylvania, this court finds that this forum is appropriate to litigate the claims presented.

### 5. *The separate claims of the individual plaintiffs are insufficient in amount to support separate claims or their likely recovery*

Rule 1708 also requires the court to consider the amount of damages sought by the individual plaintiffs in determining the fairness and efficiency of a class action. Thus, a court must analyze whether, in view of the complexities of the issues or the expenses of litigation,

the separate claims of individual class members are insufficient in amount to support separate claims. Pa.R.C.P. 1708(a)(6). Alternatively, the rules ask the court to analyze whether it is likely that the amounts which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action. Pa.R.C.P. 1708(a)(7). This criteria is rarely used to disqualify an otherwise valid class action claim. See *Kelly v. County of Allegheny,* 519 Pa. 213, 215, 546 A.2d 608, 609 (1988) (Trial court erred in refusing to certify a class on the grounds that the class members' average claim was too small in comparison to the expenses incurred.). However, in *Klusman v. Bucks County Court of Common Pleas,* 128 Pa. Commw. 616, 631, 564 A.2d 526, 534 (1989) the court refused to certify a class whose average recovery would have been $3.55. The Commonwealth Court said: "Where the issue of damages does not lend itself to a mechanical calculation, but requires separate mini-trials of a large number of individual claims, courts have found that the staggering problem of logistics make the damage aspect of the case predominate and renders the class unmanageable as a class action. *State of Alabama v. Blue Bird Body Co. Inc.,* 573 F.2d 309 (5th Cir. 1978)."

"To verify that each of the 108,107 claims suffered actual damages, would present an administrative nightmare because of the overwhelming number of transactions between parties that would be required to be examined. *Mekani v. Miller Brewing Co.,* 93 F.R.D. 506 (E.D. Mich. 1982). Petitioners argue these determinations go to the merits. This evaluation of the question of manageability, though ultimately involved with the merits, must

be examined in order to determine the efficiency of the class action. *In re Industrial Gas Litigation,* 100 F.R.D. 280 (N.D. Ill. 1983). We recognize that numerous courts have certified classes of large numbers with small amounts of potential recovery."

No such problems are presented in this case. Herein, the amounts claimed vary tremendously. Some claims are as much as $50,000 while more than half just above $5,000. Although the amounts vary, if any sums are owing to class members, administration is simple and straightforward. For many class members the amounts involved may not warrant individual litigation. The criteria is met.

Appropriateness of equitable or declaratory relief

Since plaintiff does not seek equitable relief it is not necessary to consider the criteria set forth in Pa.R.C.P. 1708(b).

Having weighed the Rule 1702 requirements, this court finds that a class action is a fair and efficient method for adjudicating plaintiff's claim and an appropriate order is issued herewith.

## CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all its members would be impracticable.

(2) There are questions of law and fact common to the class.

(3) The claims of plaintiff are typical of the class claims.

(4) Plaintiff will fairly and adequately assert and protect the interests of the class.

(5) Allowing class claims provides a fair and efficient method for adjudication of the criteria set forth in Pa.R.C.P. 1708.

## CONCLUSION

For these reasons, this court grants plaintiff's motion for class certification. Plaintiff's counsel is appointed as counsel for the class. The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within 30 days from the date of this order.

A contemporaneous order consistent with this opinion is filed.

## ORDER

And now, July 27, 2004, upon consideration of plaintiff's motion for class certification, all responses in opposition, the respective memoranda, all matters of record, and in accordance with the contemporaneous memorandum opinion, it hereby is ordered and decreed as follows:

(1) Plaintiff's motion for class certification is granted.

(2) A class is hereby certified and defined as follows:

"All employees of defendant SMS during the calendar year 1998 who were participants in SMS' incentive compensation plans and whose 1998 ICP compensation was reduced pursuant to the 'SMS adjustment.' Excluded from the class are the individual defendants and the members of SMS' leadership team during 1998."

(3) Plaintiff is designated as the class representative.

(4) Plaintiff's counsel is appointed as counsel for the class.

(5) The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within 30 days from the date of this order.

